UNITED DEFENSE GROUP, P.C.
Eric A. Chase (Bar No. 148030)
Nancy Yamini, (Bar No. 245036)
4181 Sunswept Drive, Ste. 100
Studio City, CA 91604
Telephone (818) 487-7400
Fax (818) 487-7414

Attorney for Defendant,
MICHAEL DAVID RAMIREZ

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 1:07 cr 00109 LJO |
| Plaintiff, | |
| vs. | MOTION TO SUPPRESS DEFENDANT'S STATEMENTS; AND POINTS AND AUTHORITIES IN SUPPORT THEREOF. |
| MICHAEL DAVID RAMIREZ | |
| Defendant. | Date: November 9, 2007<br>Time: 8:30 a.m.<br>Place: Courtroom Four<br>Honorable: Lawrence J. O'Neill |

NOTICE IS HEREBY GIVEN that on November 9, 2007, at 8:30 a.m., at the courtroom of the Honorable Lawrence J. O'Neill, defendant Michael David Ramirez will move the court for an order suppressing any and all evidence of statements made by him that the government may seek to introduce against him at the trial of this action, which were obtained in the course of an interrogation while executing a search warrant on January 19, 2007 at the following residential location: 474 Driskell Avenue, Newman, California.

The motion will be made on the grounds that the introduction of such evidence before the trier of fact would violate the defendant's right against compulsory self-incrimination, and his right to due process of law as guaranteed by the Fifth Amendment to the United States Constitution. Specifically, i) defendant's statements were made involuntarily under threat of authority; and ii)

defendant's statements were elicited by the government during a custodial interrogation in which he was not advised of his *Miranda* rights.

This motion will be based on this notice of motion, the attached memorandum of points and authorities, the attached affidavits and exhibits, all documents and papers already on file with the court, as well as such additional oral and documentary evidence as may be introduced at the hearing on the motion.

Dated: October 12, 2007.

> Respectfully Submitted,
> UNITED DEFENSE GROUP, P.C.
>
> By: ___/s/    Eric A. Chase___ .
> Eric A. Chase
> Nancy Yamini
> Attorneys for Defendant,
> MICHAEL DAVID RAMIREZ

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant submits the following points and authorities in support of the motion to suppress the statements made by him:

### I.

### STATEMENT OF FACTS

On May 17, 2007, Michael David Ramirez ("Michael") was charged with a two-count indictment for an alleged violation of 18 U.S.C. §§ 2252(a)(2) and 2252(a)(4)(B), possession and receipt/distribution of material involving the sexual exploitation of minors.

A search warrant was issued on January 17, 2007 (Ex. A at 00003) on the basis of an affidavit filed by Mike Prado ("Agent Prado"), a Senior Special Agent with the Department of Homeland Security, United States Immigration and Customs Enforcement ("ICE") assigned to the Office of the Resident Agent in Charge ("RAC") in Fresno, California. (Ex. B.)

On January 19, 2007 at about 6:30 a.m., agents from the Fresno ICE RAC office executed the warrant. (Ex. C.) About 8 or 9 law enforcement officers knocked loudly on the Ramirez's door and announced they had a search warrant. (Ex. D ¶ 5; Ex. F ¶ 5.) Michael's mother Carmen Ramirez ("Carmen") opened the door. (Ex. D ¶ 6.) The agents demanded that she point them to Michael's room. (*Id.*) They also asked whether there was anyone else at the house. (*Id.*) Carmen told the agents that her son Ricky Ramirez ("Ricky") was in his room and another son, Julian, was sleeping in the living room. (*Id.*)

Ricky, Michael's 21 year-old brother, heard the commotion and walked into the living room. (Ex. E ¶ 4.) A federal agent held up a gun about a foot from his face and told him to put his hands in the air. (*Id.*) Another federal agent entered Michael's room with a shotgun. (Ex. E ¶ 5.) The agent pointed the shotgun at Michael and instructed him to put his hands up and get out of the room. (Ex. F ¶ 5). Michael and his younger brothers, Ricky and Julian, were forced to line up against the wall at the entrance of their house. (*Id.*; Ex. D ¶ 8; Ex. E ¶ 5.) The officers handcuffed Michael and Ricky Ramirez, but did not handcuff Julian. (Ex. D ¶ 8; Ex. E ¶ 5.) The officers did not administer a *Miranda* warning, nor did they otherwise advise Michael or Ricky of their rights. (Ex. F ¶ 6; Ex. D ¶ 8; Ex. E ¶ 5.)

Some time later, Michael and Ricky were led to the living room and were told to sit on the sofa while agents searched their house. (Ex. F ¶ 7; Ex. E ¶ 6.) A few agents still had their guns pointed in the direction of the Ramirez brothers and their mother. (Ex. F ¶ 7.) The agents did not present the search warrant and refused to tell the family what they were searching for. (Ex. F ¶ 8; Ex. E ¶ 6.)

Approximately 45 minutes later, two officers, Special Agent Prado and Special Agent Craig Finley ("Agent Finley"), took Michael to his sister's room for interrogation. (Ex. F ¶ 9; Ex. D ¶ 11; Ex. E ¶ 7.) Michael's sister's room is small, and has a large bed taking up a significant portion of the space in the room. (Ex. F ¶ 9.) The agents sat Michael down on the bed, still handcuffed, and, without reading him his rights, began shouting at him. (Ex. F ¶ 8, 9.)

Agent Prado screamed at Michael "Do you know why I'm here?" (Ex. F ¶ 10.) Michael replied that he did not know. (*Id.*) Agent Prado yelled back that Michael should "quit being a bitch" and that he should know why the officers were there. (*Id.*) Michael told the officers that he did not know what Agent Prado was talking about. (*Id.*) This barrage of yelling and cursing continued for hours, (*id.*) while Michael remained handcuffed. (Ex. F ¶ 9.) Additionally, when Michael informed the officers that he had a headache, they told him he was not allowed to leave. (Ex. F ¶ 11.) They advised him that if he confessed to "what [he] did" then he would not be arrested. (Ex. F ¶ 12.)

During that time Ricky was sitting on the sofa in the living room, near where Michael was undergoing interrogation. (Ex. E ¶ 6, 7.) He could hear the officers yelling at his brother, using words like "fucking" and "bitch." (Ex. E ¶ 7.) Shortly thereafter, two officers took Ricky to Michael's room for questioning. (Ex. E ¶ 8.) Like Michael, Ricky was in handcuffs during the interrogation and was also not administered a *Miranda* warning. (Ex. E ¶ 10.)

Meanwhile, Agent Prado continued to increase the pressure on Michael to confess. He told him that the government found "stuff" on Ricky's computer and that Ricky would be sent to jail too. (Ex. F ¶ 13.) Michael insisted that he had no idea what Agent Prado was talking about. (Ex. F ¶ 13.) So Agent Prado clarified by screaming "you were downloading child pornography." (Ex. F ¶ 13.) Michael vehemently denied doing that and Agent Prado continued

to yell "stop being a fucking little bitch, admit that you did it." (Ex. F ¶ 13.) Agent Prado warned Michael that "you put shit on your brother's computer and you and your brother are both going to go to jail." (Ex. F ¶ 14.) Agent Prado promised to "leave [Ricky] alone" if Michael confessed, and threatened to arrest Ricky if he did not. (Ex. F ¶ 14.)

About an hour into the interrogation, Michael asked to use the restroom. (Ex. F ¶ 15.) The interrogating officers told him that he could not leave the room until they were done questioning him. (*Id.*) They told him that they did not care that he had to go to work and warned him that they will continue the interrogation until he told them what he did, even if it took all day. (*Id.*)

Agent Prado then threatened Michael that neither he nor his younger brother Ricky would see their mother again unless he confessed. (Ex. F ¶ 16.) Agent Finley clarified that Michael and Ricky were likely to face five years in prison for possession of child pornography. (*Id.*)

In the adjacent room, Ricky was also confronted with similar questions. (*See* Ex. E ¶¶ 9, 14.) The questioning officers asked Ricky if he downloaded child pornography. (Ex. E ¶ 9.) Ricky replied that he did not, but added that sometimes he inadvertently downloaded mislabeled files. (Ex. E ¶¶ 9, 11.) Approximately 30 minutes into the interview, the interrogating officers uncuffed Ricky and told him he had to sign a document. (Ex. E ¶ 10.) Ricky, who was 21 years old at the time and unfamiliar with law enforcement, was so shaken and scared that he did not concentrate on reading the document provided by the agents. (*Id.*) Nor did the officers purport to inform Ricky of its content or advise him of his *Miranda* rights. (*Id.*)

While he was being questioned, Ricky continued to hear the yelling and cursing coming from his sister's room next door, where Agents Prado and Finley were interrogating his older brother. (Ex. E ¶ 14.) He heard the officers shouting at Michael that "we know you did it," and that he should "be a man" and "quit being a little bitch." (*Id.*) Ricky could also hear Michael crying. (*Id.*)

One of the officers interrogating Ricky asserted that he knew Ricky downloaded child pornography. (Ex. E ¶ 11.) Ricky defiantly told the officer that this was a lie and challenged him to find such files on his computer. (*Id.*) The officer left the room to check Ricky's

computer (*id.*) and later returned asking "where is it? What did you do with it? Where are the files?" (Ex. E ¶ 12.) The officers continued to unsuccessfully attempt to extract a confession from Ricky for about 20 more minutes. (Ex. E ¶¶ 13, 15.) But his answers to questions of whether he downloaded or watched child pornography were consistently "no." (Ex. E ¶ 13.) The officers then escorted Ricky back to the living room. (Ex. E ¶ 15.) Again, he continued to hear more shouting and cursing coming from his sister's room, where Agents Prado and Finley were interrogating Michael. (Ex. E ¶ 15.)

After approximately two hours of being subjected to relentless shouting and cursing, Michael, 23 years of age, was tired, scared, suffering from a headache, and needed to use the restroom. (Ex. F ¶ 17.) The interrogating officers refused to stop until Michael confessed. (*Id.*)

Faced with no other options under the circumstances, and fearful for his younger brother, Michael ultimately acquiesced. He told the officers "fine, Whatever. You guys are the cops and if you say I did it, then I guess I did it. Right?" (Ex. F ¶ 18.) Agent Prado replied "that's exactly how it is." (*Id.*) But the officers were not satisfied with a passive oral admission, and continued to threaten Michael with arrest if he did not provide a written statement. (*Id.*) Michael asked the officers what they wanted him to put in the statement. (Ex. F ¶ 19.) The officers removed Michael's handcuffs, handed him a piece of paper, and dictated a statement for him to write and sign. (Ex. F ¶¶ 19, 20.)

Once Michael had signed the statement, and approximately 3 hours after his interrogation began, the officers opened his sister's bedroom door and Michael was allowed to leave the room. (Ex. F ¶ 20.) According to Ricky and Carmen, Michael returned flustered and appeared as though he had been crying. (Ex. E ¶ 17; Ex. D ¶ 15.) In fact, Michael looked so terrible that Ricky was concerned he had been beaten by the officers. (Ex. E ¶ 17.) Michael was then led into the kitchen and handed a stack of papers to sign. (Ex. F ¶ 21.) The officers told him that the papers concerned the seizure of his computer equipment. (*Id.*) Too overwhelmed by the three hours of harsh, berating, and unremitting interrogation, Michael signed the papers provided by the agents without reading them. (*See id.*) He does not know what he signed. (*Id.*; Ex. E ¶ 18;

*see* Ex. D ¶ 16.) He is certain, however, that the officers never issued him a *Miranda* warning and that he was unaware of his rights during the questioning. (Ex. F ¶ 21.)

Soon thereafter, the officers handed over a copy of the search warrant and exited the Ramirez home. (Ex. F ¶ 22; Ex. E ¶ 19; Ex. D ¶ 17.) In total, search and interrogation lasted about four hours. (Ex. F ¶ 23.) At no point during the four hours did any of the eight or nine law enforcement agents administer a *Miranda* warning to either Michael or Ricky. (Ex. F ¶ 21; Ex. D ¶ 20; Ex. E ¶ 10.)

## II.

## ARGUMENT

### A. Statements Made by Michael Ramirez Were Obtained From Him Involuntarily and Through Coercion, and Should Be Suppressed

Before a criminal defendant's statement can be used against him, the government must prove its voluntariness by a preponderance of the evidence. *See Lego v. Twomey*, 404 U.S. 477, 489 (1972); *United States v. Pinion*, 800 F.2d 976, 980 (9th Cir. 1986). An inculpatory statement is voluntary only when it is the product of a rational intellect and a free will. *Blackburn v. Alabama*, 361 U.S. 199 (1960); *United States v. Crespo de Llano*, 830 F.2d 1532, 1541-42 (9th Cir. 1987).

A coerced or involuntary statement, which violates a suspect's rights under the Fifth Amendment, is not admissible at trial for any purpose. *See United States v. Eccles*, 850 F.2d 1357, 1361 (9th Cir. 1988). A statement is involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897). The promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances. *See Hutto v. Ross*, 429 U.S. at 30; *Miller v. Fenton*, 796 F.2d 598, 608 (3d Cir. 1986).

The test for voluntariness is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper

1  inducement so that the suspect's will was overborne. *Haynes v. Washington*, 373 U.S. 503, 513-
2  14 (1963); *United States v. Pinion*, *supra*, 800 F.2d at 980; *Derrick v. Peterson*, 924 F.2d 813,
3  817 (9th Cir. 1990); *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981).  This inquiry
4  necessarily assesses "both the characteristics of the accused and the details of the interrogation."
5  *United States v. Williams*, 435 F.3d 1148, 1153 (9th Cir. 2006) quoting *Schneckloth v.
6  Bustamonte*, 412 U.S. 218, 226-27 (1973).  Courts consider various factors when determining
7  voluntariness, including the youth of the accused, his education and intelligence, the lack of any
8  advice to the accused of his constitutional rights, the length of detention, the repeated and
9  prolonged nature of the questioning, and the use of physical punishment such as the deprivation
10 of food or sleep.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

11       In addition to the above factors, "threats to arrest members of a suspect's family may
12 cause a confession to be involuntary."  *United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993)
13 (holding that defendant's statements to police were involuntary because of threats to arrest his
14 mother and friend without probable cause) citing *Rogers v. Richmond*, 365 U.S. 534 (1961); *see
15 also Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987) (writing that "police threats to an
16 accused or his family render a resulting confession involuntary.").  Although a threat "to do what
17 the agents have a legal right to do," (such as bringing valid charges against a defendant or his
18 family,) does not render a confession involuntary, *United States v. Garcia*, 52 F. Supp. 2d 1239,
19 1255 (D. KS 1999), making threats without a legal basis to do so (that is, without probable cause
20 to believe that the family member has committed a crime,) is coercive and improper.  *See Martin
21 v. Kemp*, 760 F.2d 1244, 1248-49 (11th Cir. 1985) (reversing a district court's denial of a write of
22 habeas corpus and remanding for an evidentiary hearing on the alleged coercive threats).

23       Michael Ramirez's statements to law enforcement agents were coerced under threat of
24 authority and should be suppressed.  Through their words and actions, government agents
25 exerted improper influence on him to confess against his will.  The cumulative effect of the
26 various pressure tactics employed by the interrogating agents (such as conducting an
27 unnecessarily large-scale raid early in the morning, failing to advise a young and inexperienced
28 suspect of his rights, aggressively questioning him for hours while he was handcuffed and

complained of a headache, making baseless threats to arrest his younger brother, and refusing to allow him to use the restroom) caused his statements to be involuntary.

At the time of the interrogation, Michael was unacquainted with the criminal justice system. He was 23 years old, lived with his parents, and had no prior criminal record. He was understandably overwhelmed and frightened when 8 or 9 law enforcement agents raided his house early in the morning, handcuffed him and his brother at gunpoint, and ransacked their house.

Such an extravagant display of force during the execution of the search warrant was a transparent ploy to intimidate Michael into confessing. It was patently excessive to send approximately 9 armed law enforcement agents to search the Ramirez dwelling and to restrain the family at gunpoint in order to investigate allegations of possession and distribution of child pornography. There was no indication whatsoever that Michael or any of his family members were violent, involved with drugs or gangs, or otherwise posed a danger to the executing officers. Yet the government agents found it necessary to subject the Ramirez family to a full blown raid, of the magnitude and intensity typically reserved for much more serious and potentially violent situations.

Moreover, the interrogation techniques used during the approximately three hours of questioning were impermissibly aggressive, and served to overbear Michael's will. Michael was trapped in his sister's small room, handcuffed throughout the interrogation, and was under the belief that he was under arrest. The officers did not advise Michael of his rights. He was forced to endure two hours of cursing, yelling, and various other threats by Agents Prado and Finley. He was not allowed to leave his sister's small room even though he had a headache and needed to use the restroom. The interrogating officers repeatedly told him that they will arrest both him and his brother unless he admitted to downloading child pornography.

Michael's unfamiliarity with police theatrics and intimidation tactics caused him to interpret the interrogating officers' threats literally. That is, he was led to believe that the government obtained incontrovertible evidence against him and that his conviction was inevitable. Since he was not advised of his right to remain silent, Michael assumed he had only

two choices before him: admit to the accusations against him or continue to be subjected to repeated and prolonged questioning. More importantly, he construed Agent Prado's words to mean that if he confessed to a crime he did not commit, not only would he receive more favorable treatment from the prosecutor, but that his brother would not be arrested and charged.

Faced with threats of continued interrogations, having his younger brother arrested, and promises of leniency by the prosecuting attorney, the agents finally succeeded in breaking down Michael's will. He was tired, frightened, and eager to appease the officers in order to get them to leave. When asked whether he downloaded child pornography, Michael, still handcuffed, acquiescently replied: "if you say I did it, then I guess I did it." But the officers wanted more; they told him that he would be arrested unless he provided them with a written statement. Michael then wrote a brief statement that was dictated by the agents who interrogated him.

Although someone familiar with the criminal justice system would easily recognize these theatrics for what they are, shameless attempts by the government to scare susceptible suspects into admitting to certain offenses, a young man like Michael, with no exposure to police tactics or knowledge of his rights, would perceive the threats against him at their face value. Michael did not know that he had a right not to speak to the police. To the contrary, he was effectively told that he *must* talk. He was threatened that if he did not confess to downloading child pornography, his younger brother would be arrested too and they would both face five years in prison. He was also warned that he was not free to leave or even use the restroom until he confessed. After hours of denying he did anything wrong, Michael began to believe that he had no choice but to tell the interrogating officers what they wanted to hear. He was led to believe that it would be futile to assert his innocence since the interrogating officers made it clear to him that his arrest and conviction were imminent.

Furthermore, Agent Prado's unsubstantiated and coercive threats to arrest Michael's 21-year old brother Ricky alone are sufficient to render Michael's confession involuntary. Agent Prado had no probable cause to make such threats against Ricky. Neither the search warrant nor the supporting materials mentioned Ricky's name. When the agents arrived at the Ramirez house, they only inquired about Michael, and did not appear to be interested in Ricky until the

search was already underway.  Moreover, any potential suspicion about Ricky's involvement in the alleged unlawful activity should have been dispelled once the agents found no evidence of illicit content on his computer.  Yet Agent Prado falsely warned Michael that his younger brother Ricky would also be arrested and charged if Michael did not confess.  Acting as a protective older brother, Michael agreed to talk to his interrogators in order to extricate Ricky from the situation.

In light of Michael's age and inexperience, the unsupported threats to arrest his younger brother, and because he was not aware of his right to remain silent or to an attorney, the interrogation tactics employed by Agents Prado and Finley unconstitutionally coerced Michael into providing false yet incriminating statements to the government.

### B. Statements Made By Michael Ramirez to Law Enforcement Officers During His Custodial Interrogation Are Inadmissible Because Law Enforcement Agents Failed to Provide Adequate *Miranda* Admonitions

This Court should also suppress Michael's statements because the interrogating officers did not provide him with any meaningful admonitions about of his Fifth Amendment rights to an attorney or to remain silent.

The prosecution may not introduce evidence obtained during a custodial interrogation of a defendant unless it can demonstrate that the suspect has been provided with four warnings: "the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *See Miranda v Arizona,* 384 US 436, 444, 479 (1966).  The warnings about the rights to silence and counsel are absolute prerequisites to custodial interrogation.  *See id.*

Moreover, the warnings must be clear, not susceptible to equivocation, and cannot be misleading.  *United States v. San Juan-Cruz*, 314 F.3d 384, 387 (9th Cir. 2002).  "What *Miranda* requires 'is meaningful advice to the unlettered and unlearned in language which [they] can comprehend and on which [they] can knowingly act.'"  *Id*. (quoting *United States v. Connell*, 869 F.2d 1349, 1351 (9th Cir. 1989)).

A defendant may waive his or her *Miranda* rights, provided the waiver is made voluntarily, knowingly, and intelligently. *See Miranda v Arizona* 384 US 436, 467 (1966); *Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. . . . [and] the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."). The burden is on the prosecution to establish that a defendant validly waived his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 475 (U.S. 1966) (holding that "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.") The validity of a Miranda waiver depends on the totality of the circumstances and whether the defendant "was aware of the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Labrada-Bustamante*, 428 F.3d 1252, 1259 (9th Cir. 2005); *see also United States v. Cazares*, 121 F.3d 1241, 1244 (9th Cir. 1997) (stating that "the voluntariness of a waiver has always depended on the absence of police over-reaching.").

All statements proffered by Michael Ramirez prior to or during his custodial interrogation on January 19, 2007, must be suppressed because he was not advised of his right to remain silent and his right to an attorney. The government's failure to follow these simple yet fundamental constitutional safeguards violated Michael's Fifth Amendment right against self incrimination, thereby rendering his admissions inadmissible.

That the interrogation was custodial should not be in dispute. Michael was handcuffed throughout the interrogation, and was explicitly and repeatedly told that he was not free to leave, even after complaining of a headache and asking to use the restroom. Although no evidence has thus far been produced to suggest that the interrogating officers actually arrested Michael, the circumstances surrounding the search and subsequent interrogation clearly indicate that Michael reasonably thought he was in custody and was not allowed to leave his sister's room during the questioning.

Once he was in custody, the interrogating officers were required to administer *Miranda* warnings to Michael before interviewing him. Yet Agents Prado and Finley failed follow procedure and did not issue any warnings during the nearly four hours they spent at the Ramirez house. Notwithstanding a generic investigation report drafted by Agent Finley, which asserts that Michael was provided *Miranda* warnings, two witnesses, in addition to Michael, aver that they never heard the agents advise Michael of his rights. And the only time they saw Michael signing documents occurred *after* the interrogation ended. This lapse in fundamental law enforcement procedure, whether intentional or not, is inexcusable, and Michael's statement must be therefore be suppressed.

Assuming, *arguendo*, that Agents Prado and Finley did, in fact, provide to Michael the requisite *Miranda* warnings, the prosecution will nevertheless be unable to overcome its "heavy burden" of showing that Michael voluntarily waived his rights, given the extraordinary and unreasonable pressure exerted on Michael during the interrogation. As discussed in detail above, Michael, who was 23 years old at the time and had no prior interaction with law enforcement, was awakened at gunpoint, handcuffed, endured hours of cursing and berating questioning, and was threatened that his brother would be arrested unless he confessed. Michael was clearly traumatized by the interrogation (to the point where his brother thought that he had been beaten by the officers). No rational person aware of his rights would have voluntarily waived them under these conditions. Indeed, Michael repeatedly expressed his desire to pause or end the questioning, but the interrogating officers continued to shout obscenities at him and pressured him to confess. Taking these factors into consideration, any alleged waiver by Michael of his *Miranda* rights could not have been made voluntarily, knowingly or intelligently.

                                                Respectfully Submitted,
                                                UNITED DEFENSE GROUP, P.C.

                              By: ___/s/___Eric A. Chase_____.
                                  Eric A. Chase
                                  Attorney for Defendant,
                                  MICHAEL DAVID RAMIREZ